NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13383

COMMONWEALTH  vs.  DANIEL BRUM.


Bristol.     April 5, 2023.  -  August 10, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Assault and Battery by Means of a Dangerous Weapon.  Evidence,
    Testimony before grand jury, Identification, Prior
    inconsistent statement, Hearsay, Opinion, Videotape.
    Identification.  Deoxyribonucleic Acid.  Practice,
    Criminal, Argument by prosecutor.



    Indictment found and returned in the Superior Court
Department on October 30, 2020.

    The case was tried before Robert C Cosgrove, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    John P. Warren for the defendant.
    Stephen C. Nadeau, Jr., Assistant District Attorney, for
the Commonwealth.
    Anton Robinson, of New York, Katharine Naples-Mitchell,
Eliza Lockhart-Jenks, Radha Natarajan, & Chauncey B. Wood, for
Criminal Justice Institute at Harvard Law School & others, amici
curiae, submitted a brief.

GEORGES, J.  The defendant, Daniel Brum, was found guilty of assault and battery by means of a dangerous weapon in connection with the August 30, 2020, stabbing of the victim, Jordan Raposo.  Prior to trial, the victim's then girlfriend, Shyla Bizarro, identified the defendant to the police as the victim's attacker from surveillance video footage.  She also testified to her identification of the defendant from the surveillance video before a grand jury.

Prior to Bizarro's testimony at trial, however, a voir dire of Bizarro revealed that she intended not only to recant both her statements to police and her grand jury testimony but also to claim that the victim pressured her into making those prior statements.  As a result, the trial judge admitted substantively the portions of Bizarro's grand jury testimony that she had recanted, including her prior statements of identification.  See Commonwealth v. Cong Duc Le, 444 Mass. 431, 439-441 (2005); Commonwealth v. Daye, 393 Mass. 55, 75 (1984); Mass. G. Evid. § 801(d)(1)(A), (C) (2023).

On appeal, the defendant challenges whether the admitted portions of Bizarro's grand jury testimony fell within the hearsay exemptions for prior inconsistent statements, see Mass. G. Evid. § 801(d)(1)(A), and statements of identification, see Mass. G. Evid. § 801(d)(1)(C).  He also challenges the admissibility of portions of that testimony on other independent

grounds, including that it contains multilevel hearsay and inadmissible lay opinion testimony. Additionally, the defendant raises various other evidentiary errors and asserts that portions of the prosecutor's closing argument were improper.

For the reasons discussed infra, we conclude that the trial judge properly admitted portions of Bizarro's grand jury testimony in accordance with the hearsay exemption for prior inconsistent statements. See Daye, 393 Mass. at 75; Mass. G. Evid. § 801(d)(1)(A). We further conclude that the portions of Bizarro's grand jury testimony identifying the defendant in the surveillance video independently satisfied the hearsay exemption for statements of identification. See Cong Duc Le, 444 Mass. at 439-441; Mass. G. Evid. § 801(d)(1)(C). In particular, we decline to adopt the defendant's argument that the statements of identification within Bizarro's grand jury testimony did not satisfy the requirements under our common law as nonhearsay under Cong Duc Le and Daye because Bizarro was not a percipient witness to the underlying crime. Finding no grounds for reversal on that basis or in the defendant's remaining arguments, we affirm the defendant's conviction.[1]

---

[1] We acknowledge the amicus brief submitted by the Criminal Justice Institute at Harvard Law School, the New England Innocence Project, the Massachusetts Association of Criminal Defense Lawyers, and the Innocence Project.

Facts.  "Because the defendant does not challenge the sufficiency of the evidence at trial, we briefly summarize it, reserving certain details" for later discussion of the alleged errors.  See Commonwealth v. Maldonado, 466 Mass. 742, 744, cert. denied, 572 U.S. 1125 (2014).

Just before noon on August 30, 2020, the victim was stabbed while outside a convenience store in New Bedford.  Security camera video footage showed the victim walking out of the store, into the parking lot, and toward a minivan.  The perpetrator then jogged up to the victim, punched the victim, and jabbed his arm towards the victim's groin area.  After the attack, the perpetrator jogged away, climbed into a dark-colored sport utility vehicle (SUV), and drove out of the store parking lot.  The injured victim then got into the minivan and drove off.

Around the time of the attack, Maria Mattias and her husband, Andrew Brum, the defendant's brother, were at their home in New Bedford, along with their nephew, Carlos Santos.  Mattias and Santos were in the back yard when they saw the victim enter the back yard, bleeding and stumbling.[2]  Blood was

---

[2] The defendant's brother and his wife were familiar with the victim.  The defendant's brother had worked with the victim as masons for several years and knew each other independent of the victim's relationship with the defendant.  As discussed infra, the defendant and the victim had been roommates earlier that summer, but animosity had grown between them after the victim kicked the defendant out of that living situation.

dripping from the victim's waist and, before collapsing and appearing to lose consciousness, he stated that he needed help. While they waited for emergency services, Mattias discovered that the victim was bleeding from a wound to his groin. The minivan that the victim had driven to Mattias's and Brum's house was still running, and the door was open.

Bizarro, the victim's girlfriend at the time, arrived at Mattias's and Brum's home soon after medical personnel. Bizarro appeared shocked, upset, and frantic. The victim was transported to Rhode Island Hospital, where it was determined that he had suffered four stab wounds: one to the groin, one to his left leg, and two to his scrotum.

In the aftermath of the stabbing, New Bedford police officers retrieved the convenience store's video surveillance footage that showed the attack. The next day, a police officer discovered a Ford Edge SUV parked one-half mile away from the store that matched the description of the perpetrator's vehicle as seen in the surveillance video footage. After police seized the Ford Edge, they determined that it had been rented by the defendant. They conducted deoxyribonucleic acid (DNA) tests on the Ford Edge; the defendant's DNA, as well as that of from three to five other potential contributors, was identified in

traces of occult blood[3] in the Ford Edge. The victim's DNA did not match any of the profiles.

In October 2020, Bizarro testified before a Bristol County grand jury. She testified that she had known the defendant for over fifteen years; they had grown up in the same area of New Bedford, and Bizarro had gone to the same school as the defendant and his brother. Additionally, she testified that the defendant and the victim had been roommates that summer, and that there was animosity between them because the defendant felt that the victim had unfairly kicked the defendant out of their apartment. Bizarro also testified that, although she did not recognize the Ford Edge seized by police, she knew that the defendant often drove rental cars.

Bizarro further testified that, on the day of the stabbing, she had received a telephone call from the victim, where he claimed that "DB stabbed me."[4] She stated to the grand jury that the victim sounded frantic and nervous on the telephone call, and he was breathing heavily. Bizarro testified that on the day after the stabbing, she had spoken with police officers at the New Bedford police station, where she was shown the surveillance

---

[3] Occult blood is blood not visible to the naked eye. See Commonwealth v. Marquetty, 416 Mass. 445, 446 (1993).

[4] Bizarro testified that the victim referred to the defendant as "DB" and that she knew the defendant by this nickname.

video footage.  Prior to viewing the footage, she had told officers that she knew who had stabbed the victim and that it was the defendant.  Bizarro further testified that, after viewing the footage at the police station, she told police that she was "[p]ositive" that the defendant was the perpetrator. When the surveillance video footage was played before the grand jury, Bizarro testified that she was able to identify the defendant from the video because of his "clothes," "hair," and "by the way he[ was] walking," as the defendant "has a very distinctive walk."

Later that month, the grand jury indicted the defendant on a charge of assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A (b).  The defendant filed several pretrial motions concerning the anticipated evidence at trial.  Among those denied were motions to exclude the DNA test results and to exclude Bizarro's grand jury testimony where she identified the defendant from the surveillance video footage. The judge reserved for trial the defendant's motion to exclude Bizarro's grand jury testimony where she claimed that the victim told her, "DB stabbed me."

The defendant was tried before a jury from June 22 to June 25, 2021.  At trial, the judge conducted a voir dire of Bizarro prior to her testimony to ascertain, pursuant to the requirements in Daye, 393 Mass. at 75, whether Bizarro's grand

jury testimony was admissible substantively under the hearsay exemption for prior inconsistent statements.[5]  See Mass. G. Evid. §§ 104(a), 801(d)(1).[6]  During the voir dire, Bizarro recanted extensive portions of her grand jury testimony.  She denied her prior recollections of the day of the stabbing and any

---

[5] The voir dire of Bizarro was requested by defense counsel.

[6] Section 104(a) of the Massachusetts Guide to Evidence provides:

> "The court must decide any preliminary question about whether a witness is qualified or competent, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by the law of evidence, except that on privilege."

Section 801(d) provides in pertinent part:

> "A statement that meets the following conditions is not hearsay:

> "(1) A declarant-witness's prior statement.  The declarant testifies and is subject to cross-examination about a prior statement, and the statement

> "(A)(i) is inconsistent with the declarant's testimony; (ii) was made under oath before a grand jury . . . ; (iii) was not coerced; and (iv) is more than a mere confirmation or denial of an allegation by the interrogator; [or]

> ". . .

> "(C) identifies a person as someone the declarant perceived earlier."

Here, although portions of Bizarro's grand jury testimony ostensibly contained statements of identification, the trial judge relied solely on the hearsay exemption for prior inconsistent statements in determining that the testimony was substantively admissible nonhearsay.

recollection of her interactions with police the day after the stabbing, including her identification of the defendant from the surveillance video footage. She likewise denied her identification of the defendant before the grand jury. Finally, she maintained that any statements she had given to police or in her grand jury testimony were due to coercion by the victim, who she claimed was abusing her at the time.

Based on his observations of Bizarro during the voir dire and contradictions in her anticipated testimony, the judge made the following findings: that there was opportunity to cross-examine her at trial; that her prior statements were in her own words and not coerced; and that she was feigning when she said she was unable to recall various events. Based on those findings, the judge allowed inconsistent portions of Bizarro's grand jury testimony to be admitted for their truth. The judge and counsel for each party then reviewed Bizarro's grand jury testimony together to determine which portions had been recanted and thus would be substantively admissible at trial. During that process, defense counsel made contemporaneous objections to the admission of various parts of Bizarro's grand jury testimony.

Bizarro testified before the jury consistent with her voir dire. Among other things, she recanted her identification of the defendant from the surveillance video footage in the police

station and her grand jury testimony of that identification, claiming that she did not recall seeing the surveillance video footage at the police station. Instead, she claimed that she could not tell the identity of the perpetrator from the footage, and that the perpetrator "look[ed] like a random tall white guy" who "could [have] be[en] anybody." When shown still images from the video at trial, Bizarro remarked that she could not identify the attacker as the defendant and that it was "a very poor quality picture/video," a "horrible video." Bizarro testified that she had only previously identified the perpetrator as the defendant because the victim pressured her into doing so. The trial judge then allowed the substantive admission of the previously reviewed portions of her grand jury testimony and instructed the jury accordingly.

The jury convicted the defendant of assault and battery by means of a dangerous weapon, and the defendant was sentenced to a term of from four to seven years in State prison. The defendant timely appealed, and we granted his application for direct appellate review.

Discussion. On appeal, the defendant challenges the trial judge's substantive admission in evidence of portions of Bizarro's grand jury testimony that she recanted at trial, including her prior identifications of the defendant in the surveillance video. The defendant also challenges admission of

portions of that grand jury testimony on independent evidentiary grounds, including the presence of multilevel hearsay and lay opinion testimony that he claims was improperly admitted.  The defendant also challenges the admission of testimony by a police officer who identified the defendant's vehicle from its license plate by "zooming in" on certain video footage; he challenges the admission of DNA and occult blood evidence; and he asserts reversible error arising from the prosecutor's closing argument.  Addressing each of these claims in turn, we conclude there is no basis on which to reverse the defendant's conviction.

1.  Standard of review.  At trial, the defendant raised timely objections to several of the errors now before us on appeal.  Where the defendant's objections were preserved, we review for prejudicial error.  See Commonwealth v. Gonsalves, 488 Mass. 827, 835 (2022).  Where the defendant did not raise a timely objection, we review the alleged errors to determine whether they gave rise to a substantial risk of a miscarriage of justice.  See Commonwealth v. Davis, 487 Mass. 448, 464 (2021), S.C., 491 Mass. 1011 (2023).

2.  Substantive admission of Bizarro's grand jury testimony as nonhearsay.  a.  Prior inconsistent statements.  As a preliminary matter, we agree with the trial judge that all the admitted portions of Bizarro's grand jury testimony satisfied the requirements of the hearsay exemption for prior inconsistent

statements made under oath, see Daye, 393 Mass. at 73-74; Mass G. Evid. § 801(d)(1)(A). As noted supra, a prior inconsistent statement of a declarant witness is substantively admissible under Mass G. Evid. § 801(d)(1)(A), if the "declarant testifies and is subject to cross-examination about a prior statement, and the statement (i) is inconsistent with the declarant's testimony; (ii) was made under oath before a grand jury . . . ; (iii) was not coerced; and (iv) is more than a mere confirmation or denial of an allegation by the interrogator." See note 6, supra.

Here, upon making a preliminary determination that Bizarro was feigning a lack of memory, the trial judge properly and carefully reviewed Bizarro's grand jury testimony -- with the assistance of counsel -- to determine which portions of that testimony qualified as "inconsistent" statements for purposes of the relevant hearsay exemption. See Commonwealth v. Sineiro, 432 Mass. 735, 742 (2000) (witness's claim of lack of memory qualifies as "inconsistent" for purposes of Mass. G. Evid. § 801[d][1][A]). See also Mass G. Evid. §§ 104(a) (judge decides preliminary questions), 801(d)(1)(A) (hearsay exemption for prior inconsistent statements). The defendant does not dispute this preliminary determination, nor does he dispute the trial judge's further determinations that Bizarro was subject to cross-examination, that the statements were made under oath

13

before a grand jury, and that the testimony was more than a mere confirmation or denial. Rather, the defendant argues that the testimony was inadmissible under Mass. G. Evid. § 801(d)(1)(A) because (1) there was an insufficient showing that the statements were "not coerced"; (2) the Commonwealth failed to introduce evidence corroborative of the grand jury testimony; and (3) the declarant (Bizarro) was not a percipient witness to the crime, see Daye, 393 Mass. at 73 n.18. We discern no error.

With respect to potential coercion, the record reflects that the judge conducted a careful and comprehensive voir dire of Bizarro and found that her prior statements were voluntary, and her lack of memory was feigned. Although Bizarro testified to the abusive nature of her relationship with the victim, including that he told her to say certain things to police, the judge, as the fact finder, was not obligated to credit that testimony in finding that Bizarro's previous statements were made in her own words. See Commonwealth v. DePina, 476 Mass. 614, 622 (2017). Bizarro claimed to lack any memory of previously identifying the defendant -- a claim which persisted even when presented with video of her prior identification and her signature and identifying marks on video still images. Under those circumstances, it was not erroneous for the judge to discredit Bizarro's voir dire testimony that she was either

unable to recall her prior identifications of the defendant or had not made the identifications in the first place.

Second, the issue of corroborative evidence raised by the defendant has no bearing on the admissibility of Bizarro's grand jury testimony. We stated in Daye, 393 Mass. at 74-75, that the Commonwealth must offer corroborative evidence where grand jury testimony relates to an essential element of the offense. However, we later clarified that such a requirement goes to the separate question of the "sufficiency of the evidence rather than to its admissibility." DePina, 476 Mass. at 621 n.5, citing Commonwealth v. Clements, 436 Mass. 190, 193 (2002). Because the defendant does not challenge the sufficiency of the evidence, we decline to review it here and conclude that Bizarro's grand jury testimony was admissible under the hearsay exemption for prior inconsistent statements, irrespective of any corroborative evidence.

Lastly, we address the defendant's claim that Bizarro's testimony failed to meet the requirements of the hearsay exemption for prior inconsistent statements because Bizarro was not a percipient witness to the crime. For support, the defendant points to a footnote in our opinion in Daye, 393 Mass. at 73 n.18, which states:

   "We predicate probative use of prior inconsistent
   statements on a showing that the declarant was a percipient
   witness to the events in question. If it is clear from the

context in which the statement was made that the statement was based on hearsay, rather than personal knowledge, the statement may not be admitted as probative evidence."

The initial sentence of the footnote seems to restrict the use of prior inconsistent statements under Mass. G. Evid. § 801(d)(1)(A) to situations in which the declarant was a "percipient witness" to the "events in question," but it does not specify which events are the "events in question." The sentence that follows, however, clarifies that the operative distinction is whether the prior statement "was based on hearsay, rather than personal knowledge." Per the footnote in Daye, a prior inconsistent statement that is based on hearsay "may not be admitted as probative evidence." In Daye itself, the relevant prior inconsistent statement also was a statement of identification, and the requirement of personal knowledge was satisfied when the witness observed the defendant during the commission of the crime. Daye, 383 Mass. at 73.

Nothing in Daye, however, or our subsequent case law limits the substantive use of prior inconsistent statements to circumstances where the testifying witness is present at the scene of a crime. See, e.g., Commonwealth v. Trotto, 487 Mass. 708, 723-725 (2021) (witness's grand jury testimony detailing conversation where defendant described circumstances of victim's death was admissible as prior inconsistent statements, despite witness's absence at scene); DePina, 476 Mass. at 621-623

(witness's grand jury testimony describing her seeing defendants' possession of handgun prior to shooting admissible, despite witness not being present at shooting); Commonwealth v. Noble, 417 Mass. 341, 347 (1994) (witness's grand jury testimony pertaining to codefendant's conversation of crime substantively admissible when witness was percipient witness to the conversation, not the crime); Commonwealth v. Carrasquillo, 54 Mass. App. Ct. 363, 366, 370-371 (2002) (victim's statement of identification of defendant as shooter partially based on childhood spent together).

The defendant asks us to interpret the footnote in Daye in a manner that would confound the current practice of courts and counsel, see, e.g., Trotto, 487 Mass. at 723-725, when considering the admissibility of prior inconsistent statements. We decline to do so. Moreover, it is clear from the context of Daye that the limitation discussed in footnote 18 applied only to prior inconsistent statements of identification, not prior inconsistent statements in general. As discussed infra, our treatment of statements of identification has evolved significantly since that opinion. See part 2.b, infra. See also Cong Duc Le, 444 Mass. at 437-441; Mass. G. Evid. § 801(d)(1)(C) note.

b. Statements of identification. Although this basis was not addressed by the trial judge, we note that the portions of

Bizarro's grand jury testimony where she identified the defendant in the surveillance video were independently admissible for their truth as nonhearsay under the exemption for prior statements of identification. See Cong Duc Le, 444 Mass. at 437-441; Mass. G. Evid. § 801(d)(1)(C). The defendant moved in limine to exclude this evidence and renewed his objection at trial; therefore, we review for prejudicial error. See Gonsalves, 488 Mass. at 836.

The admissibility of prior statements of identification is governed by the principles set forth in Cong Duc Le, 444 Mass. at 436-437 (adopting Proposed Mass. R. Evid. § 801[d][1][C], and overruling Daye as to "limitations . . . placed on the use of extrajudicial identification evidence"). The defendant's primary argument regarding these statements echoes his argument concerning percipience and Daye addressed in part 2.a, supra: because our jurisprudence limits the substantive admission of prior statements of identification to identifications made by a percipient witness and not those contained in lay opinion testimony of a nonpercipient witness, Bizarro's identifications are inadmissible on these grounds. The defendant first seeks support for this argument in the language of Cong Duc Le itself, namely, its requirement that the prior statement be "one of identification of a person [made] after perceiving him" (emphasis added). See Cong Dug Le, supra; Mass. G. Evid.

§ 801(d)(1)(C) (to be admissible under this subsection, statement must "identif[y] a person as someone the declarant perceived earlier"). The defendant contends that the verb "perceive," as used in Cong Duc Le and Mass. G. Evid. § 801(d)(1)(C), is limited to perception of the person who is the subject of the identification during the commission of the crime.

We disagree, as the rule we adopted in Cong Duc Le contains no such restriction. Instead, the requirement that a statement be "one of identification of a person [made] after perceiving him" refers only to the fact that the declarant's basis for the identification must be personal knowledge, not hearsay. In Cong Duc Le, 444 Mass. at 433, that personal knowledge arose from declarant's perception of the defendants during the commission of the crime, as well as his personal history with the defendants. This requirement may be also satisfied where the sole basis for the declarant's identification is years of acquaintance with -- and perception of -- the subject, as Bizarro's was here. See Commonwealth v. Raedy, 68 Mass. App. Ct. 440, 449 n.14 (2007) ("perceive" language in § 801(d)(1)(C) "focuses on the nature of the statement . . . identifying the person after the declarant has perceived that person," without limiting basis of perception).

Our precedent considering witness identifications more generally supports this understanding.  We have held that "[t]he probative value of [an] identification depends on the strength of its source."  Commonwealth v. Johnson, 473 Mass. 594, 601 (2016) (considering fairness of out-of-court identifications).  The strength of an identification's independent source is determined by different factors, including the "witness's prior familiarity with the person identified, where that person is a witness's family member, friend, or long-time acquaintance."  Id. at 601-602.  As such, a witness's "long and close relationship" with the identified subject and "considerable familiarity" with the subject's physical characteristics may very well make an identification more reliable than "a 'single' or 'brief' exposure to a suspect in frightening conditions" immediately after the commission of a crime.  See Commonwealth v. Vasquez, 482 Mass. 850, 861 (2019), quoting Commonwealth v. Chamberlin, 86 Mass. App. Ct. 705, 713 (2014).  Cf. Commonwealth v. Crayton, 470 Mass. 228, 242 (2014) (eyewitness's familiarity with defendant prior to crime "good reason" to allow in-court showup as initial identification procedure).  "When such familiarity is present," even without presence at the scene of a crime, "those witnesses may be able to discern identifying characteristics that others could not, rendering their visual

identifications, in some circumstances, less unreliable."
Vasquez, supra.

Turning to Mass. G. Evid. § 801(d)(1)(C), which "has its origins in our common law of evidence," Commonwealth v. Adams, 458 Mass. 766, 771 (2011), we note that appellate courts' consideration of out-of-court identifications focus on the reliability of the basis of the identification, rather than the identifying witness's presence at the criminal activity. For example, in Adams, supra at 771, we held the admission of out-of-court identifications was not limited to formal identification procedures, as an identifying witness who "kn[ows] the defendant well," like the defendant's brother, was a "more reliable pretrial statement of identification" than "a witness's selection of a photograph of someone he does not know." Our common-law prioritization of an identification's reliability over the form of how that reliability is achieved is especially relevant for Mass. G. Evid. § 801(d)(1)(C), which exempts statements from categorization as unreliable hearsay.

We note finally that our interpretation of the current rule as adopted in Cong Duc Le is entirely consistent with the footnote in Daye as it pertains to Mass. G. Evid. § 801(d)(1)(A), discussed supra. In sum, neither Cong Duc Le nor Daye (as modified in Cong Duc Le) requires that a prior statement of identification or a prior inconsistent statement

made under oath be based on a witness's perception of the individual during the commission of the crime.

3. Other challenges to admissibility of Bizarro's grand jury testimony. In addition to raising the threshold issue of whether the entirety of Bizarro's grand jury testimony is admissible nonhearsay under Mass. G. Evid. § 801(d)(1)(A), the defendant argues that specific portions of the grand jury testimony were inadmissible on other evidentiary grounds.

a. Lay opinion testimony identifying defendant in surveillance video. The defendant contends that Bizarro's grand jury testimony identifying the defendant from the video footage was inadmissible lay opinion testimony because it was "not helpful" to the jury, see Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 325 (2000), and any probative value was outweighed by its prejudicial effect, see Commonwealth v. Wardsworth, 482 Mass. 454, 477 (2019).

A "witness's opinion concerning the identity of a person depicted in a surveillance [video] is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." Commonwealth v. Vacher, 469 Mass. 425, 441 (2014), quoting Pleas, 49 Mass. App. Ct. at 326. "Put another way, such testimony is admissible . . . when the witness possesses sufficiently relevant familiarity with the defendant

that the jury cannot also possess" (quotation omitted).  Vacher, supra, quoting Pleas, supra at 326-327.

In denying the defendant's pretrial motion to exclude this portion of Bizarro's grand jury testimony, the trial judge reviewed the video footage and determined "that the identification testimony of one with some familiarity with the defendant would be helpful to the jury."  The judge elsewhere noted that the surveillance video footage was not excellent quality, but also was not "hopelessly obscure"; the footage showed a sunny day, with minimal blur.  See Pleas, 49 Mass. App. Ct. at 325.  Additionally, the judge was presented with facts that Bizarro knew the defendant since middle school and that the defendant recently had been her boyfriend's roommate.  See Vasquez, 482 Mass. at 861 (witnesses had long relationship with defendant as basis for video identification).  Bizarro also testified before the grand jury that she had been able to identify the defendant from the surveillance video by "his clothes, by the way he's walking, . . . everything."  See id. (witnesses had familiarity with defendant's "stature, gait, appearance, clothing, and features").  Even though both the jury and Bizarro were able to view the same surveillance footage, Bizarro was "specifically familiar with the defendant, such that [she] could provide special insight into his appearance."  Cf. Wardsworth, 482 Mass. at 476 (opinion identification testimony

from officers with no independent familiarity of defendant prejudiced defendant).  In these circumstances, the judge did not abuse his discretion in determining that Bizarro's testimony had a proper foundation and would be helpful to the jurors, who had the video and still images from the video before them.

Nor are we persuaded by the defendant's alternative argument that, even if the testimony met the requirements for admission of lay opinion testimony, the probative value of the evidence was substantially outweighed by its prejudicial effect where Bizarro recanted the testimony at trial.  Appellate courts reviewing the admission of lay opinion identification from a video only require that there be "some basis for concluding that the witness is more likely to correctly identify the defendant from the [video] than is the jury."  Vacher, 469 Mass. at 441, quoting Pleas, 49 Mass. App. Ct. at 326.  The purpose of requiring such a foundation for lay opinion testimony is so the jury have enough information to allow them to "conduct an independent assessment of the accuracy and reliability of [the witness's] identifications."  Commonwealth v. Connolly, 91 Mass. App. Ct. 580, 592-593 (2017).  If subsequent testimony calls into question the "accuracy and reliability" of a witness's identification, that is a matter for the jury to resolve, not the judge.  See id.  This is especially the case for statements of identification that fall under Mass. G. Evid. § 801(d)(1)(C),

which contemplates scenarios where the jury are "confronted with disputed testimony concerning identification." Cong Duc Le, 444 Mass. at 439-440. Rather than prejudice the defendant, the fact that a prior identification is disputed is helpful to the jury "in evaluating the over-all evidence as to whether the defendant on trial was the one who committed the charged offense." Id. at 440-441. This is so even when a prior identification is self-disputed, as Bizarro's was here.

b. Multilevel hearsay. The defendant argues that a statement made by the victim to Bizarro -- "DB stabbed me" -- and introduced through Bizarro's grand jury testimony should have been excluded under Daye as multilevel hearsay, because the declarant of the underlying statement was unavailable for cross-examination. Because the defendant objected before and at trial, we review the admission of this statement for prejudicial error. See Gonsalves, 488 Mass. at 835. Finding none, we conclude that the defendant's argument is without merit.

Multilevel hearsay is admissible "only if each of the multiple hearsay statements falls within an exception to the hearsay rule." DePina, 476 Mass. at 623, citing Commonwealth v. Gil, 393 Mass. 204, 218 (1984); Mass. G. Evid. § 805 (2023). As discussed supra, the first layer of statements challenged as multilevel hearsay -- Bizarro's statement to the grand jury, which she recanted at trial -- is nonhearsay and admissible for

its substance as a prior inconsistent statement of a declarant witness.  See Mass. G. Evid. § 801(d)(1)(A).  The defendant's assertion that this statement is inadmissible because the victim was not available for cross-examination at trial, in contradiction of the requirements in Daye, rests on a misapplication of the rule.  Because it is Bizarro's statement that is of concern under Mass. G. Evid. § 801(d)(1)(A), Bizarro is the declarant who must be, and was, available for cross-examination at trial.  As explained infra, the underlying statement of the victim -- "DB stabbed me" -- that Bizarro repeated in her testimony is separately admissible as a spontaneous utterance.  Thus, cross-examination of the victim, as the declarant of that underlying statement, was not required for it to be admitted, unless that underlying statement violated the confrontation clause of the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.

"Out-of-court statements offered for the truth of the matter and asserted by a declarant who does not testify at trial must pass two 'distinct but symbiotic' tests to be admitted." Commonwealth v. Rand, 487 Mass. 811, 815 (2021), quoting United States v. Brito, 427 F.3d 53, 60 (1st Cir. 2005), cert. denied, 548 U.S. 926 (2006).  "First, the statement must be admissible under our common-law rules of evidence as an exception [or

exemption] to the hearsay rule."  Rand, supra, quoting

Commonwealth v. Beatrice, 460 Mass. 255, 258 (2011).  "Second,

the statement must be nontestimonial for purposes of the

confrontation clause of the Sixth Amendment."  Rand, supra,

quoting Beatrice, supra.

The victim's statement that "DB stabbed me" is admissible

under the spontaneous utterance exception to the hearsay rule.

In reviewing whether an out-of-court statement comes within this

exception, courts consider "whether there was an exciting event

that would give rise to the exception," and then "whether the

declarant displayed a degree of excitement sufficient to

conclude that [the] statement was a spontaneous reaction to the

exciting event, rather than the product of reflective thought."

See Commonwealth v. Santiago, 437 Mass. 620, 624-625 (2002).

Here, it is beyond dispute that being stabbed multiple times in

the groin and scrotum constitutes an exciting event.  See

Commonwealth v. Nesbitt, 452 Mass. 236, 246 (2008) (stabbing

qualifies as exciting event).  After being attacked, the victim

drove away from the scene while bleeding.  He then stumbled into

the back yard of acquaintances to seek help and care, leaving

the engine of the car he had driven there still running and the

door open.  On the telephone with Bizarro, when he gave the

statement, the victim sounded "flustered."  Soon after, the

victim nearly lost consciousness and had to be transported

directly to an out-of-State hospital due to the severity of his injuries.  It was unlikely that the circumstances facing the victim at that time were conducive to dispassionate, reflective thought.

The victim's statement also was nontestimonial.  "Testimonial statements are those made with the primary purpose of 'creating an out-of-court substitute for trial testimony.'"  Commonwealth v. McGann, 484 Mass. 312, 316 (2020), quoting Wardsworth, 482 Mass. at 464.  "The inquiry is objective, asking not what that particular declarant intended, but rather 'the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances.'"  Commonwealth v. Imbert, 479 Mass. 575, 580 (2018), quoting Williams v. Illinois, 567 U.S. 50, 84 (2012).

The victim's statement, taken together with the rest of his statements to Bizarro and his demeanor on the call, evinces that he was attempting to seek aid and have his girlfriend join him in a medical emergency.  See Rand, 487 Mass. at 817 ("when preoccupied by an ongoing emergency, a victim is unlikely to have the presence of mind to create a substitute for trial testimony").  The victim sounded frantic and nervous on the telephone call to Bizarro just after being attacked while en route to the house of an acquaintance to get help.  See McGann, 484 Mass. at 318 (victim's "hysterical" statements to mother on

telephone calls after violent attack were nontestimonial). Again, almost immediately after getting to the home, with blood dripping from his waist, the victim collapsed and appeared to lose consciousness. Given the circumstances, the victim's statement does not demonstrate an intent to create a substitute for trial testimony, see Rand, supra, and the judge did not err in admitting it.

c. Other portions of grand jury testimony. The defendant also contends that three other specific portions of Bizarro's grand jury testimony should have been excluded because they were speculative, lacked proper foundation, and contained inadmissible hearsay: her statement to police that she "knew who it was" who stabbed the victim, namely, the defendant; her statements to police that that she "knew" the defendant was driving a rental car on the date of the attack, "because he gets them often"; and her statements to police concerning the animosity between the defendant and victim as the defendant's motive for the attack. Having reviewed the defendant's arguments and the record, consisting of Bizarro's grand jury testimony, her voir dire at trial, and her trial testimony, we conclude that any error in the admission of these statements did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Desiderio, 491 Mass. 809, 817 (2023).

Bizarro's statements that she knew who the attacker was and that she knew the defendant was driving a rental car based on habit were cumulative of other, more powerful and properly admitted testimony; namely, the victim's statement that "DB stabbed me," see part 3.b, supra, and evidence of the defendant's rental car agreement, see part 5, infra. See DePina, 476 Mass. at 623-624.[7]

And while the portion of Bizarro's grand jury testimony concerning animosity between the defendant and victim lacked adequate foundation, its admission did not create a likelihood of a miscarriage of justice. See Commonwealth v. Moffat, 486 Mass. 193, 200 (2020) ("Lay witnesses may only testify regarding matters within their personal knowledge"). Bizarro testified to the grand jury that she thought the defendant and victim had a falling out because the victim told the defendant that they could no longer be roommates; she "wasn't there" to see the defendant's reaction, but she "kn[e]w that they argued" and that the victim had not been answering the defendant's telephone calls for a while. Earlier before the grand jury, Bizarro

---

[7] We note that our current law prohibits the use of evidence of an individual person's habit to prove action in conformity with that habit, see Commonwealth v. Wilson, 443 Mass. 122, 138 (2004); Mass. G. Evid. § 406(b) (2023). This case law is not in line with the Federal Rules of Evidence, see Fed. R. Evid. § 406. Nonetheless, we leave the consideration of our treatment of habit evidence for another day.

testified that she knew the defendant and victim had been roommates for about two months in the summer of 2020, but the Commonwealth did not elicit, either before the grand jury or at trial, foundational details regarding how Bizarro came to know of the disagreement between the two men.

While the prosecutor touched upon Bizarro's grand jury testimony regarding motive in his closing argument -- stating that the jury had "heard . . . as to why [the victim] was stabbed" and that it was due to the "falling out" -- he also mentioned that the jury were instructed to scrutinize Bizarro's testimony as an immunized witness, and that motive was not an element of the crime.  Given that at trial, Bizarro directly contradicted this portion of her grand jury testimony, and that the prosecutor did not overly rely on this portion of Bizarro's testimony in making his case to the jury, we cannot say it substantially risked a miscarriage of justice to have the jury weigh these statements.  See DePina, 476 Mass. at 624-625.

4.  Direct examination of Bizarro regarding her professed motivation to lie.  At trial, when the Commonwealth asked Bizarro about her previous identification of the defendant during her grand jury testimony, where she had signed her initials on still images of the surveillance video footage, Bizarro responded that she was "doing what [she] was told by [the victim]."  The defendant objected to this answer and moved

to strike Bizarro's response, which was overruled. The Commonwealth continued to ask Bizarro about whom she had identified in the still images from the surveillance video footage; Bizarro responded that she "was told to say that it was [the defendant]," which the defendant did not object to. On appeal, the defendant maintains that all of Bizarro's statements to that effect were hearsay that "had no proper purpose in advancing the Commonwealth's case," and even if properly admitted, risked unfair prejudice to the defendant. See Gonsalves, 488 Mass. at 835.

"An out-of-court statement introduced to impeach a witness, and not to prove the truth of the matter asserted, is not hearsay." Commonwealth v. Schoener, 491 Mass. 706, 729 (2023), citing Commonwealth v. Denson, 489 Mass. 138, 149 (2022). Parties may impeach their own witnesses, see Mass. G. Evid. § 607 (2023), including via prior inconsistent statements, so long as a proper foundation is made. See Commonwealth v. McAfee, 430 Mass. 483, 489-490 (1999), citing G. L. c. 233, § 23.

Here, the Commonwealth's line of questioning was permissible as a means of impeaching Bizarro, as it invited comparison of the inconsistencies between Bizarro's trial and grand jury testimonies, exposing her lack of credibility as a trial witness. See Sineiro, 432 Mass. at 742. The

Commonwealth's questions -- and Bizarro's responses --
juxtaposed Bizarro's inability to recall anything incriminating
she had previously said about the defendant, with her only
remaining memory:  that of the victim's supposed coercion.  The
judge did not err in allowing the Commonwealth to ask questions
that permitted the jury to "hear all of [Bizarro's] version of
events" while deciding whether her testimony at trial or her
testimony to the grand jury was the truth.  Id. at 743.  See
Clements, 436 Mass. at 195 (determination of reliability of
pretrial identification versus in-court disavowal is matter for
jury); Daye, 393 Mass. at 73-74 (jury may use their "common
sense" to weigh probative worth of identification, given their
observation of witness and her "rejection on the stand of [her]
prior statement").

Although no limiting instruction was provided for this
impeachment evidence, the defendant did not request one, and
there likely was no prejudice to the defendant from the
admission of the statements.[8]  See Commonwealth v. Lester, 486

---

[8] Prior to Bizarro's testimony at trial, the defendant had
requested "contemporaneous" instructions on the use of prior
inconsistent statements for impeachment purposes.  Immediately
prior to Bizarro's in-court testimony, the judge proceeded to
give general instructions that the jury should limit the use of
any prior inconsistent statements to consideration of a
witness's credibility.  During Bizarro's direct examination, the
defendant did not request limiting instructions in response to
the Commonwealth's questions or Bizarro's answers.  Prior to

Mass. 239, 253 (2020) (party concerned about purpose for which impeachment testimony is admitted has burden of requesting appropriate instruction at time statement is admitted). This is because, if Bizarro's answers were considered substantively by the jury, they arguably would be helpful to the defendant. Indeed, Bizarro's trial testimony indicated that her prior identifications of the defendant were made, at the very least, due to the victim's suggestions, if not his directives to outright lie. If those answers were accepted for their truth by the jury, the defendant was not harmed, but arguably was helped by them. See Maldonado, 466 Mass. at 759. Moreover, the prosecutor's closing remarks invited the jury to "throw Ms. Bizarro's testimony out the window," and nothing elsewhere in the record indicated that either party wished the jury to consider these statements for their truth. See Commonwealth v. Charles, 397 Mass. 1, 7 (1986). "[W]e are substantially confident that, if the error had not been made, the jury verdict would have been the same." Maldonado, supra, quoting Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998).

5. License plate testimony. At trial, a detective testified to the process used by police in identifying the SUV

---

Bizarro's grand jury testimony being read in evidence, the court gave updated instructions to the jury that they could consider Bizarro's grand jury testimony for its substance.

seen in the surveillance video footage as the Ford Edge rented by the defendant. During that testimony, the detective indicated that he identified the license plate on the SUV in the surveillance video footage as being from Florida, the same State as the license plate on the defendant's rented Ford Edge. The detective was able to identify the State of the SUV's license plate in the video by "zooming in" on the video (close-up video) and examining the license plate's characteristics closely. Because the defendant did not object to the detective's testimony at trial, we review its admission to determine whether it created a substantial risk of a miscarriage of justice. Commonwealth v. Grady, 474 Mass. 715, 721-722 (2016).

On appeal, the defendant argues that the Commonwealth failed to lay a proper foundation for this portion of the detective's testimony. Additionally, the defendant maintains that the detective's testimony was unduly prejudicial and had limited probative value, because the jury did not have the close-up video images of the license plate before them.

As a condition of admissibility, the Commonwealth had to lay a sufficient foundation to demonstrate that a reasonable jury could find by a preponderance of the evidence that the close-up video was a genuine representation of what the detective claimed it to be; here, that foundational requirement would have been met by testimony from the detective describing

how the video footage was able to display indicators of the Florida license plate.  See Connolly, 91 Mass. App. Ct. at 587.  The Commonwealth failed to do so; foundational details were admitted only upon cross-examination of the detective.

While we agree that the officer's testimony lacked a proper foundation, it nevertheless did not give rise to a substantial risk of a miscarriage of justice.  The jury here had before them several pieces of evidence that were probative of a comparison between the defendant's Ford Edge and the SUV in the surveillance video footage, independent of the detective's testimony concerning the license plate.  Cf. Connolly, 91 Mass. App. Ct. at 592-593 (defendant prejudiced by officer's testimony concerning unavailable surveillance video, which served as only substantive evidence of alleged crime).  For instance, the surveillance footage video and still prints of both vehicles were entered in evidence, indicating other distinguishing marks that the jury could compare for themselves, such as the emblems on the front grills and stickers on the front windshields of the vehicles.  The defendant's rental agreement and a stipulation by the defendant that he had rented the Ford Edge SUV were also before the jury.  Additionally, the lay opinion testimony concerning the close-up video was not extensive.  Cf. Wardsworth, 482 Mass. at 476-477 (four officers' extensive lay opinion testimony on video evidence contributed to improper

prejudice).  The jury were able to "conduct an independent assessment of the accuracy and reliability" of the detective's testimony about the license plate based on the evidence before them.  See Connolly, supra at 593.  Any harm to the defendant was therefore mitigated.  See Vacher, 469 Mass. at 442 (erroneous admission of identification testimony harmless because "jury were capable of drawing the same conclusion" from photographs in evidence).

6.  DNA and occult blood evidence.  The defendant argues that the judge erred in admitting DNA and occult blood evidence gathered from his rented Ford Edge, as the results of the forensic tests were inconclusive and bore little relevance to issues in the case.  In denying the defendant's motion in limine to exclude the results, the judge ruled that the presence of the defendant's DNA in the rented vehicle was probative of the Commonwealth's theory that the defendant fled the stabbing in the vehicle.

At trial, the defendant consistently challenged the adequacy, thoroughness, and effort of the police investigation in opening and closing statements, as well in cross-examination of witnesses.  In particular, the defendant focused on a knife that had been present at the scene and had subsequently gone missing, rendering it unavailable for forensic testing, and the perceived failure of police to gather global positioning system

and cell site location information.  When faced with insinuations, the prosecution was entitled to introduce testimony to demonstrate that forensic analysis, including DNA testing, was performed, and that results, even inconclusive ones, were obtained, as was the case here.  See Commonwealth v. Barnett, 482 Mass. 632, 639 (2019), citing Commonwealth v. Mathews, 450 Mass. 858, 872 (2008) (inconclusive DNA results admissible where defense calls into question integrity of police investigation).  The admission of this evidence was not error.  See Gonsalves, 488 Mass. at 835.

7.  Prosecutor's closing argument.  The defendant contends that the prosecutor's direction in his closing argument that the jury should rely on the surveillance video footage was improper.  See Davis, 487 Mass. at 467.  In the absence of an objection, we review for a substantial risk of a miscarriage of justice.  Id.

In his closing, the prosecutor stated that the jury could rely on the surveillance video footage, and that from the footage the jury could discern characteristics of the perpetrator to determine that the defendant was the perpetrator.  Specifically, the prosecution described the video as "rock-solid," "a beautiful video . . . where you see [the defendant] and his skinny build, and his precise hairline, his round hair, his white skin"; "Who do you see in the video?  You see [the defendant]. . . .  I suggest to you it is [the defendant] in the

video."  "Although not dispositive, we consider the fact that the defendant did not object to the statements at trial as 'some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument" did not create a substantial risk of a miscarriage of justice.  Commonwealth v. Barbosa, 477 Mass. 658, 669 (2017), quoting Commonwealth v. Lyons, 426 Mass. 466, 471 (1998).  See Commonwealth v. Kozubal, 488 Mass. 575, 590 (2021), cert. denied, 142 S. Ct. 2723 (2022).

"[C]losing arguments must be viewed in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial" (quotation and citation omitted).  Barbosa, 477 Mass. at 670.  A prosecutor's closing argument may be based on "inferences that may reasonably be drawn from the evidence."  Commonwealth v. Lewis, 465 Mass. 119, 129 (2013), quoting Commonwealth v. Kozec, 399 Mass. 514, 516 (1987).  A prosecutor can encourage the jury to use their observations to aid them in reaching their verdict.  See Barbosa, supra.  The prosecutor may also make remarks that amount to "enthusiastic rhetoric, strong advocacy, and excusable hyperbole" (citation omitted).  Lyons, 426 Mass. at 472.  If statements fall within this permissible rhetoric, they do not cross the line between fair and improper argument.  See id.

The closing argument here is distinguishable from the opening statement at issue in Davis.  In Davis, 487 Mass. at

469, the prosecutor told the jury in the Commonwealth's opening that they would be able to identify the perpetrator as the defendant based on grainy video of an individual that only showed that the individual was a Black man with long hair in braids or dreadlocks.  The court held that the prosecutor's suggestion that the jury could identify the defendant based on the video was unreasonable, as the video's low resolution and distance from the shooter did not allow the jury to discern any features of the perpetrator's face.  Id., citing Vasquez, 482 Mass. at 861.

Here, the prosecutor's remarks, while hyperbolic at times, did not create a substantial risk of a miscarriage of justice. The surveillance footage at issue here is of a quality such that facial features are discernable at times in addition to other physical characteristics, unlike the footage in Davis.  The video here is also of relatively high resolution, not "hopelessly obscure."  Given the circumstances of this specific video footage, the prosecutor's encouragement of the jury to identify the defendant from the video procedure was reasonable and did not amount to a substantial risk of a miscarriage of justice.  Cf. Davis, 487 Mass. at 469.

Further, in discussing the video, the prosecutor informed the jury that they could not base any conviction on the video alone but had to consider the entire investigation and body of

evidence.  See Davis, 487 Mass. at 467-468 & n.25 (no error when prosecutor did not state jury could identify defendant from video alone).  The prosecutor pointed out that the evidence included Bizarro's conflicting testimony regarding her perceptions of the video and her ability to identify the defendant in it, and whether Bizarro's testimony should be credited was for the jury to decide.  See Commonwealth v. Holiday, 349 Mass. 126, 129 (1965) (acceptance or rejection of oral testimony is exclusive province of jury).  The prosecutor's encouragement to the jury to weigh Bizarro's credibility and examine the surveillance video footage was not unreasonable. See Davis, 487 Mass. at 467; Barbosa, 477 Mass. at 670 (prosecutor properly encouraged jury to use observations to evaluate evidence in reaching verdict).

Conclusion.  Finding that none of the alleged errors warrant relief, we affirm the defendant's conviction.

Judgment affirmed.